William J. ADAMS

v.

The BUDD COMPANY.

Civ. A. No. 83–1080.

United States District Court,
E.D. Pennsylvania.

March 2, 1984.
As Amended March 8, 1984.

Basil R. Horangic, Philadelphia, Pa., for plaintiff.

Carol A. Mager, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This is a diversity action in which the plaintiff, a New Jersey resident, claims breach of contract and wrongful discharge. The defendant, Budd Company (Budd), a Pennsylvania corporation with its principal place of business in Michigan, has moved for summary judgment pursuant to Fed.R. Civ.P. 56. Plaintiff, William J. Adams (Adams) seeks to recover damages for breach of an alleged oral contract of employment.

Specifically, Adams contends that as a result of Budd's representations regarding his employment in a management capacity, he changed his position within the company and was thus no longer able to rely on the provisions of the company's collective bargaining agreement. Adams further claims that he was wrongfully dismissed without cause for his role in reporting safety and quality control violations in Budd products. He sets forth counts of breach of an oral contract and wrongful discharge. Budd denies making assurances or promises to plaintiff regarding the term of employment. Budd responds that Adams was not terminated in bad faith or in violation of Pennsylvania law. For the reasons which follow, summary judgment will be entered for Budd on both counts of the complaint.

In deciding Budd's motion for summary judgment, we must determine whether any disputed issues of material fact exist which would preclude entry of judgment. *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir. 1981). As to issues of fact, all reasonable inferences from the underlying facts contained in the affidavits and depositions submitted to us must be drawn in favor of the party opposing the motion. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). Whenever Budd relies upon affidavits, depositions, and answers to interrogatories to show that there is no genuine issue of material fact, Adams must come forward with affidavits, depositions, or answers to interrogatories sufficient to contradict Budd's showing. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); Fed.R.Civ.P. 56(e).

■ The parties have proceeded under the assumption that Pennsylvania law applies to this case, and since Adams was employed in Pennsylvania and the alleged wrongful discharge occurred in Pennsylvania, we see no reason to disturb the parties' choice, which is in accord with Pennsylvania law. *See Cipolla v. Shaposka*, 267 A.2d 854, 439 Pa. 563 (1970); *Silvestri v. Slatowski*, 224 A.2d 212, 423 Pa. 498 (1966).

On the basis of the affidavits and depositions submitted by the parties, the uncontested facts may be summarized as follows:

Adams was hired into an apprenticeship program at Budd's Hunting Park plant on June 11, 1956. Upon completion of the program, he was employed as a tool and die maker. With Budd's encouragement, he attended classes at Camden City College and Glassboro State College in New Jersey, completing a Bachelor of Arts degree between September 1970 and June 1974, for which he was partially reimbursed by Budd through a tuition-refund provision in the collective bargaining agreement.

On September 5, 1973, Adams accepted an offer to join Budd's management as a supervisor in quality control. Between September 1973 and April 1979, he acted as quality control supervisor in the auto division of Budd's Red Lion plant. He was subsequently transferred to the machine shop in April 1979, and then to the railway division in August 1980.

As quality control supervisor of the railway division, Adams' duties included implementing controls necessary to insure the quality level of parts and material received, manufactured, and shipped by Budd. To carry out these duties, Adams designed and redesigned major record forms to be used by the company's safety inspectors.

On or about September 1981, Adams was given a special assignment as the Miami-Baltimore specialist giving him exclusive responsibility for the quality control of railcars manufactured by Budd under its contract with the cities of Miami and Baltimore. Plaintiff found numerous defects with the railcars which he reported to his immediate supervisor, Thomas Headley. In December 1981, Headley removed Adams from the Miami-Baltimore assignment. However, in January 1982, at the request of John Darrah, Headley's supervisor, Adams was reinstated as the Miami-Baltimore specialist. Shortly thereafter, Adams distributed a form, enumerating the large number of uncorrected defects in the railcars, to management personnel. Adams also wrote a letter in March 1982 to Headley and Darrah informing them that the first completed car contained defects which would require stripping of the railcars' interior. The car was subsequently stripped.

After this, in May or June of 1982, Adams was transferred to the quality assurance department as supervisor of vendor control. On October 14, 1982, Adams was told that he was being discharged "without cause." He received four months severance pay.

■ Budd asserts that it is entitled to summary judgment on the contract claim because the material facts, concerning which there are no genuine issues, show that no oral contract for a specified term of employment existed between Adams and Budd. Pennsylvania law presumes that an employee serves at the pleasure of an employer and the relationship may be terminated by either party and at any time, absent a specific term of duration. *Jackman v. Military Publications, Inc.*, 350 F.2d 383, 385 (3d Cir.1965); *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 451, 84 A.2d 323, 325 (1951). The plaintiff may overcome this presumption by showing the parties intended the contract to be for some definite period of time or by showing that the plaintiff-employee gave the defendant-employer consideration in addition to the employee's normal services. *McNulty v. Borden, Inc.*, 474 F.Supp. 1111 (E.D.Pa. 1979). An employer's "custom, practice or policy" can also create a contractual just cause requirement or contractual procedures by which the employer must abide. *Novosel v. Nationwide Mutual Ins. Co.*, 721 F.2d 894, 902–03 (3d Cir.1983).

In this case, there is no evidence with respect to an express oral or written contract between the parties. Instead, Adams alleges an implied contract. He contends that Budd's practice of promoting from within, coupled with the expectation that once promoted to management, the employee remains there until he retires, tends to establish an implied contract for lifetime employment.

The evidence fails to establish a contract for any definite term or duration. Adams is unable to point to a single promise or representation for lifetime employment by Budd. By his own admission, Adams was "ecstatic" with the management offer, and accepted it without any discussion as to the terms or benefits of the position. Reliance on the bare supposition that the position was expected to last until retirement does not establish a specific term of employment. Under Pennsylvania law such vague and conclusory statements are not sufficient to overcome the presumption of employment at will. *Green v. Medford Knitwear Mills Inc.*, 408 F.Supp. 577, 582 (E.D. Pa.1976).

Nor does the fact that Adams changed his position within the company so as to no longer be able to rely on Budd's collective bargaining agreement constitute sufficient consideration to overcome the presumption. *McNulty, supra,* 474 F.Supp. at 1119. Adams acknowledges that he sought a management position because it offered better benefits, a higher wage, and earlier retirement. He admitted that he knew before he accepted the position that management was not part of the collective bargaining unit, and that he accepted the offer of promotion knowing he would no longer be able to rely on the provisions of the collective bargaining agreement. Merely foregoing other activities and interests cannot be regarded as additional consideration sufficient to establish an implied contract of lifetime employment. *Lightcap v. Keaggy,* 128 Pa.Super. 348, 360, 194 A. 347, 352 (1937).

Finally, there is nothing in this summary judgment record which raises a genuine issue of material fact as to the existence of any "custom, policy, or practice" which, pursuant to *Novosel, supra,* would prevent the plaintiff's discharge. As the Third Circuit held recently in *Wolk v. Saks Fifth Avenue, Inc.,* 728 F.2d 221 at 224 (1984), a plaintiff must support the claim of the existence of such a policy in the manner required by Fed.R.Civ.P. 56. Accordingly, since there is no issue of material fact concerning the existence of a contract for a specific term, there was no employment contract to breach, and for all of the above reasons, summary judgment will be entered for Budd on the contract count.

Budd further asserts that it is entitled to summary judgment on the wrongful discharge claim because plaintiff has failed to set forth facts establishing that he was terminated in violation of a clear mandate of public policy.

At least since 1891, the established common law of Pennsylvania had been that an at-will employment relationship may be terminated at any time, by either the employer or the employee, for any reason, good or bad. *Henry v. Pittsburgh & Lake Erie Railroad Co.,* 139 Pa. 289, 21 A. 157 (1891). Starting in 1974, the Pennsylvania courts began to re-evaluate this position. In the landmark decision of *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), the Supreme Court of Pennsylvania acknowledged the possible existence of a nonstatutory cause of action for wrongful discharge:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened. The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited. But this case does not require us to define in comprehensive

fashion the perimeters of this privilege, and we decline to do so. We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

Id. at 184, 319 A.2d at 180 (footnote omitted).

Subsequent decisions have interpreted *Geary* as providing an employee a cause of action for wrongful discharge when important and well recognized facets of public policy are at stake and there is no available statutory remedy. *Harrison v. Fred S. James, P.A.*, 558 F.Supp. 438, 444 (E.D.Pa. 1983); *E.g. Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir.1979) (wrongful discharge where employee discharged for refusal to take polygraph); *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119, 255 Pa.Super. 28 (1978) (wrongful discharge where employee discharged for serving jury duty). *Compare Beidler v. W.R. Grace, Inc.*, 461 F.Supp. 1013 (E.D.Pa.1978) (no cause of action for wrongful discharge where company failed to follow its own evaluation policies—no public policy violation); *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980) (no cause of action for wrongful discharge where employee discharged after criticizing safety of employer's product—public policy not threatened). This interpretation of the Pennsylvania law on wrongful discharge has been uniformly applied by the federal courts in this Circuit. *Perks, supra,* 611 F.2d at 1363; *Boresen v. Rohm & Haas, Inc.*, 526 F.Supp. 1230 (E.D.Pa.1981); *O'Neill v. A.R.A. Services, Inc.*, 457 F.Supp. 182 (E.D.Pa.1978).

More recently, in *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894 (3d Cir.1983), the Third Circuit had occasion to review the present state of Pennsylvania law regarding wrongful discharge. The question for decision was whether a cause of action was stated in a complaint in which an employee alleged he was discharged for refusing to lobby the state legislature on the employer's behalf. The Court, in determining that a cause of action was set forth, stated:

> Having concluded thereby that an important public policy is at stake, we now hold that Novosel's allegations state a claim within the ambit of *Geary* in that Novosel's complaint discloses no plausible and legitimate reason for terminating his employment, and his discharge violates a clear mandate of public policy. The Pennsylvania Supreme Court rulings in *Geary* and *Sacks* [*v. Commonwealth of Pennsylvania, Dept. of Public Welfare*, 502 Pa.Super. 201, 465 A.2d 981] are thus interpreted to extend to a non-constitutional claim where a corporation conditions employment upon political subordination.

*Id.* at 900 (citations omitted). In vacating and remanding the case for consideration of the factual basis of the plaintiff's claim, the Court instructed the district court to employ the balancing test factors set forth for wrongful discharge cases by the Pennsylvania Superior Court in *Yaindl. Id.* at 901. In *Yaindl,* the Pennsylvania Superior Court stated that the factors to be weighed are the plaintiff's interest in making a living, his employer's interest in running its business, its motive in discharging the plaintiff, and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge. *Yaindl,* 281 Pa.Super. at 577, 422 A.2d at 620.

The facts in *Yaindl* are quite similar to the facts in this case. In *Yaindl,* the plaintiff-employee had worked for the defendant company for almost thirty years. He was considered a good employee, "willing to do anything for the company." He was chosen for a special assignment in which he was to inspect certain pumps manufactured by the defendant. After inspecting the pumps, he submitted recommendations for manufacturing changes to various department heads. Many of his recommendations were followed; however, his criticism of the manufacturing process apparently antagonized one of his superiors. The friction between the two escalated and plain-

tiff was ultimately discharged "without cause." *Id.* at 565–68, 422 A.2d at 614–15.

Despite the plaintiff's belief that he was wrongfully discharged for pointing out safety hazards, the Pennsylvania Superior Court in *Yaindl* affirmed the lower court's granting of summary judgment to the defendant-employer on the grounds that no clear public policy was threatened by the plaintiff's discharge. *Id.* at 578, 422 A.2d 620. The plaintiff's claim, the court noted, was unsubstantiated in that the record contained no indication of specific hazards posed by the pumps, no evidence of injuries, and no attempt by defendant to either hide the defects or deny responsibility. *Id.*

Turning to the present case and summarizing Adams' claim in the light most favorable to him—Adams was a twenty-six year employee of Budd; he was an exemplary employee who took his responsibilities to heart and who followed Budd's Quality Control Manual to the letter. In pointing out the numerous defects in the railcars that were his responsibility, he antagonized Headley, his immediate supervisor. Then, when a reduction in management was called for, Adams was singled out for dismissal.

While we empathize with Adams, we are bound by the Pennsylvania law. Pennsylvania does not recognize a public policy exception for pointing out defects in a company product where there is no evidence that the company attempted to hide the defects or to deny its responsibility. *Id.* at 579, 422 A.2d at 621. The praiseworthiness of Adams' motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption.

When asked for his opinion as to why he was dismissed, Adams pointed to Headley's dislike for him and his alleged inability to see "the grey area." He could point to no instances in which he believed he was being asked to do something in violation of the law. Nor does he claim that Budd attempted to either hide the defects or deny responsibility for them. On the contrary, Headley admitted that there were problems

with the railcars and that Budd had been forced, as predicted by Adams, to strip out the interior of the first car completed to correct its defects.

 Unjust dismissal continues to be a substantial problem for the nearly seventy million employees who are neither civil servants nor union members. Comment, *Protecting Employees At-Will Against Wrongful Discharge: The Public Policy Exception*, 96 Harv.L.Rev. 1931, 1934 (1983). However, this court is bound by the Pennsylvania law as to what constitutes a wrongful discharge claim. *Novosel*, 721 F.2d at 897. A federal court attempting to forecast state law must consider relevant state precedents, analogous decisions and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 663 (3d Cir.1980).

 Pennsylvania has created only a very narrow exception to the employment at-will doctrine. It has yet to recognize a cause of action in a case where an employee, like the plaintiff here, alleges wrongful discharge on the ground that he was dismissed for pointing out defects in his employer's product where there is no evidence of specific hazards or injuries caused by the cars nor evidence that the employer "attempted to hide from [the buyer] the defects in the [product] or deny its responsibility for the defects." *Yaindl*, 281 Pa. Super. at 579, 422 A.2d at 621. Summary judgment will therefore be entered in favor of Budd.

This Court concludes that summary judgment will be granted in favor of the defendant, Budd, since there is no genuine issue of material fact and the facts, interpreted in the light most favorable to the plaintiff, Adams, do not support a cause of action for wrongful discharge based upon the public policy exception.