539 A.2d 1298

**Byron L. RINEHIMER, Jr., Appellant,**

**v.**

**LUZERNE COUNTY COMMUNITY COLLEGE; Board of Trustees of Luzerne County Community College; Joseph Collis; Helen G. Crossin, Executrix of the Estate of Francis Crossin, Deceased; Anthony Recupero; Edward Brominski; Michael Turco; William Schumacher; Jean Greco and John Roman.**

Superior Court of Pennsylvania.

Argued Sept. 23, 1987.

Filed Feb. 18, 1988.

Reargument Denied April 12, 1988.

482

Daniel L. Thistle, Philadelphia, for appellant.

Stephen W. Saunders and Michael J. Donahue, Scranton, for appellee.

Before CIRILLO, President Judge, and TAMILIA and KELLY, JJ.

CIRILLO, President Judge:

Plaintiff/appellant Byron L. Rinehimer, Jr. was president of Luzerne County Community College from 1974 until he was terminated on September 23, 1980. His appeal arises from an order entered by the Court of Common Pleas of Luzerne County denying his request that the compulsory nonsuit entered against him be removed. Appellant had brought suit against the Luzerne County Community College Board of Trustees alleging that he was wrongfully discharged. Because we find that appellant failed to present sufficient evidence in his case-in-chief to enable the jury to find for him, we affirm the order of the trial court.

Rinehimer originally was given a contract for three years with the College. In 1977, 1978, and 1979 the Board extended that contract orally for one-year periods. In 1980, Rinehimer requested several times that the contract be renewed; this the College deferred doing, claiming that their reasons for refusing to consider the contract were pressing financial problems as well as appellant's election as President of the Pennsylvania Commission of Community Colleges, a position which required that he spend time away from the College.

At the same time, the College was undergoing serious problems. Robert Galardi, the Dean of the Business School, and Sam Lesante, the Chairman of the Board of Trustees, were accused of embezzling College funds. Rinehimer brought the matter before the Board; Lesante resigned, Galardi did not. Rinehimer ordered Galardi's termination, and requested a Department of Education audit. Displeased with the audit, Rinehimer then called in the Auditor General's Office and requested that they do an audit also. That audit showed that funds had indeed been misappropriated.

Rinehimer's tactics engendered a great deal of internal unrest, as well as public comment unfavorable to the College. According to the Board, this as well as lack of leadership led to his termination on September 23, 1980. His oral contract had ended in April of that year, so that he

was, in effect, working on a day-to-day basis when he was terminated.

Rinehimer filed suit against the Board, alleging that he had been fired in retaliation for exposing Galardi and Lesante. He claimed that three other College officials instrumental in the investigation were also let go after he was fired, and that the Board had rehired Galardi, in spite of evidence against him. At trial, the court refused to allow testimony from the investigating auditor that Rinehimer claimed would show that several employees had refused to cooperate with the audit for fear of being fired, evidence of lost wages, and evidence of criminal prosecutions against LeSante, Galardi, and others. At the close of Rinehimer's case, the trial judge granted a nonsuit. Rinehimer filed posttrial motions requesting that the compulsory nonsuit be removed; this request was denied. Rinehimer then appealed to this court.

Rinehimer argues on appeal that the nonsuit was improper because he did establish a claim for wrongful discharge; his discharge violated public policy and so took him out of the presumption of at-will employment accepted in this Commonwealth. He also claims that the nonsuit was improper because he detrimentally relied upon a promise to renew the contract. Rinehimer further argues that the trial court erred in making several evidentiary rulings, specifically that it erred in refusing to allow testimony of the investigating auditor, in refusing to allow testimony concerning criminal investigations arising from the results of the audit, and in refusing to allow evidence of lost wages. Lastly, Rinehimer asks that venue be transferred to Philadelphia because of the sensitive political nature of the case.

In examining the grant or denial of a request to remove a compulsory nonsuit, the appellate court must view the evidence in the light most favorable to the plaintiff in the underlying case, giving him the benefit of all reasonable inferences of fact in his favor arising from that evidence. *Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park,* 509 Pa. 553, 559, 506 A.2d 862, 865 (1986). A

compulsory nonsuit will be affirmed on appeal "only where it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing that evidence in the light most favorable to the plaintiff, could determine the controlling issue in plaintiff's favor." *Stevens v. Commonwealth, Dept. of Transp.*, 89 Pa.Commw. 309, 312–313, 492 A.2d 490, 492 (1985). After considering all of Rinehimer's evidence, along with the inferences most favorable to him drawn from that evidence, we are unable to find that the trial court erred in granting the nonsuit. Further, we do not see that it erred in its evidentiary rulings. It is also clear to us that even if Rinehimer had been permitted to place the testimony in question before the jury, a nonsuit would have been proper. We do not find it necessary upon our disposition of this case to reach the question of venue.

The courts of this Commonwealth have long recognized that an employer has the right to discharge an employee who has no definite contract of employment at any time and for any reason. *Henry v. Pittsburgh & L.E.R.R.*, 139 Pa. 289, 21 A. 157 (1891). This doctrine, the "at-will" employment doctrine, was reaffirmed by the Supreme Court of Pennsylvania in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). In that case, Geary, an at-will employee involved in the sale of tubular products to the gas and steel industry, was discharged following his attempts to have United States Steel remove from the market a product that he did not feel was adequately tested. He had gone over the heads of several supervisors to a vice-president in charge of sales of the product in his attempts to be heard. Although the product was eventually removed, Geary was discharged.

Geary filed suit; the company's preliminary objections in the nature of a demurrer were sustained. On appeal, Geary argued first, that he had been discharged maliciously, and second that his discharge contravened public policy. The court affirmed the decision of the trial court, finding that

Geary had failed to plead facts that would support a cause of action. It found that he had, in effect, made a "nuisance" of himself, and that the natural inference to be drawn from the chain of events was that the company discharged him to preserve administrative order. According to the court, this was a legitimate reason for the discharge. "This hardly amounts to an 'ulterior motive,' much less to 'disinterested malevolence'...." *Id.*, 456 Pa. at 180, 319 A.2d at 178.

In addressing the public policy question, the court expressed great concern over the company's interest in protecting its managerial prerogative: "The praiseworthiness of Geary's motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption." *Id.*, 456 Pa. at 183, 319 A.2d at 180. It is from this concern that the court's holding arises:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened. The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited.... We hold [however] that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

*Id.*, 456 Pa. at 184–185, 319 A.2d at 180.

■ *Geary*, therefore, re-emphasized this Commonwealth's commitment to the at-will employment doctrine. This court has recently reiterated that commitment in *Greene v. Oliver Realty Co.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987). We have also recognized, as did the supreme court, that exceptions to the at-will doctrine exist. We have indicated that an implied contract could exist in an employee

handbook that explicitly indicates that discharge will be for just cause only. *See, e.g., Greene, supra; Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985); *Richardson v. Cole Memorial Hospital*, 320 Pa.Super. 106, 466 A.2d 1084 (1983). Additional consideration given the employer by the employee also removes the case from the at-will doctrine. *See Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571 (1986). Courts of some states have implied just cause requirements in all terminations, *see* Comment, *The Role of Federal Courts in Changing State Law: The Employment At-Will Doctrine in Pennsylvania*, 133 U.Penn L.Rev. 227 (1984); Pennsylvania is not among these.

■ Pennsylvania has, however, recognized the public policy exception to at-will employment. This court has held that an employee who can show that his discharge violated public policy and that there was no legitimate and plausible reason for that termination can make out a cause of action despite his at-will status. This exception is, however, a narrow one, *Martin v. Capital Cities, Inc.*, 354 Pa.Super. 199, 222, 511 A.2d 830, 842 (1986), and we have never indicated that it could be considered independent of the employer's right to run his business as he sees fit. *Householder v. Kensington Mfg. Co.*, 360 Pa.Super. 290, 295–296, 520 A.2d 461, 464–465 (1987). In only two cases since *Geary* has this court found that public policy considerations outweighed an employer's interest in running his business: *Hunter v. Port Auth.*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (employee convicted of assault and pardoned by governor made out claim for wrongful discharge by public employer because there is public policy against stigmatizing former offenders); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (employee discharged either because failed to inform employer about jury duty or because of jury duty; under second theory, damages recoverable because of public policy of promoting responsibility of serving on juries). In determining what the parameters of this exception are, and how they should be applied to this

case, we must turn to recent decisions of this court which have analyzed and applied this particular exception.

In *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980), the court interpreted *Geary* to imply that the legitimacy of the employer's reason for discharge could depend upon its motive and manner of discharging the employee. *Id.*, 281 Pa.Superior Ct. at 572–573, 422 A.2d at 617. The court discussed a set of factors to be considered in analyzing the applicability of the public policy exception, analogizing an action for wrongful discharge to an action for tortious interference with contract:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other. . . .

*Id.*, 281 Pa.Superior Ct. at 574, 422 A.2d at 618. In applying these factors, the court found that it had to balance the employee's interest in making a living, the employer's interest in running its business, its motive for discharging the employee, its manner of effecting the discharge, and any social interests or public policies implicated in the discharge. *Id.*, 281 Pa.Superior Ct. at 577, 422 A.2d at 620. According to that court, the outcome of this balancing exercise was the precise extent to which the employer's interest in running his business could be limited by public policy considerations. *Id.*, 281 Pa.Superior Ct. at 572, 422 A.2d at 617.

This court addressed the public policy exception again in *Cisco v. United Parcel Services*, 328 Pa.Super. 300, 476 A.2d 1340 (1984). Reviewing the important case law in the area, the court held that, in analyzing a claim for wrongful discharge, a thorough examination of all the circumstances surrounding the termination was imperative. *Id.*, 328 Pa. Superior Ct. at 306, 476 A.2d at 1343. Although stating that this was what the *Yaindl* court had done in coming to

its decision, *id.*, 328 Pa.Superior Ct. at 305–306 n. 3, 476 A.2d at 1343 n. 3, the court, in effect, redefined the *Yaindl* balancing test: "First, we must discern whether any public policy is threatened thereby; second, even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so." *Id.*, 328 Pa.Superior Ct. at 306, 476 A.2d at 1343. It seems to us that the factors cited by the *Yaindl* court (aside, of course, from consideration of any public policy involved) now go to the second part of the *Cisco* test, that is, determining the legitimacy of the employer's interest.

Clearly, in *Cisco*, this court made the determination that the employer's interest in the operation of his business is an overriding concern for the courts to consider in determining whether a cause of action will lie for wrongful discharge. *Accord Turner v. Letterkenny Federal Credit Union*, 351 Pa.Super. 51, 55, 505 A.2d 259, 261 (1985) ("It is clear that [recent case law] demonstrate[s] a pattern of favoring the employer's interest in running its business"). Although admitting that there was a public policy which prevents employers from considering "any experience with the criminal justice system that falls short of a conviction," *Cisco*, 328 Pa.Super. at 307, 476 A.2d at 1343, the court nonetheless found a legitimate business reason for the employee's termination: "We have concluded that a plausible and legitimate reason for appellee's discharge existed in that his employer was protecting its reputation by discharging an employee who was accused of theft and trespass in connection with his employment, even though a jury ultimately acquitted him." *Id.*, 328 Pa.Superior Ct. at 308, 476 A.2d at 1344.

The public policy aspect of the analysis still remains important, however. In more recent cases, we merely have seen fit to redefine its parameters. In *Turner*, we noted that while the *Yaindl* test was still a part of the wrongful discharge analysis, the employee had to show a "violation of a *clearly mandated* public policy which 'strikes at the heart of a citizen's social right, duties, and responsibilities.'"

*Turner*, 351 Pa.Super. at 55, 505 A.2d at 261 (emphasis added) (quoting *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 899 (3rd Cir.1983)). This court has refused to find that such a public policy exists where an employee was discharged for actively seeking a position with a competitor, *McCartney v. Meadowview Manor, Inc.*, 353 Pa.Super. 34, 36–37, 508 A.2d 1254, 1255 (1986) (employer has right to expect loyalty from employees); where relations with those under the employee's supervision had deteriorated irretrievably, *Turner*, 351 Pa.Super. at 55–56, 505 A.2d at 261 ("'even an unusually gifted person may be of no use to his employer if he cannot work effectively with his fellow employees'"); where an employee was discharged even though he had done the job well, *Betts v. Stroehmann Bros.*, 355 Pa.Super. 195, 199, 512 A.2d 1280, 1282 (1986) (balance between employee's and employer's interests not a specific, mandated public policy; competitive worldwide economy made it necessary for employer to have flexibility in choosing work force); where false accusations of criminal behavior had led to discharge, *Gillespie v. St. Joseph's Univ.*, 355 Pa.Super. 362, 364–365, 513 A.2d 471, 473 (1986) (as a matter of law university could discharge employee who had been accused of crime of dishonesty even though accusations were proven to be false); and where an employee claimed that every person has a right to earn a living in a job that he chooses, *Marsh v. Boyle*, 366 Pa.Super. 1, 8, 530 A.2d 491, 495 (1987).

The analysis, therefore, calls for a case-by-case determination of the circumstances and policies in question. Rinehimer claims that he was discharged for exposing the illegal activities of a member of the Board and a dean of the College. He appears to be arguing both that a specific intent to harm him is evident from the facts presented, and that his discharge went against public policy as he was attempting to prevent the embezzlement of funds and punish the wrongdoers. Keeping in mind that in reviewing the refusal to remove a compulsory nonsuit we must review the evidence in the light most favorable to the plaintiff and give him the benefit of all favorable inferences, we nevertheless

cannot find that the College violated any clearly mandated public policy.

We recognize, of course, that the employer's interest in the operation of his business is not completely unfettered. This court has indicated that that interest will be outweighed by allegations that the discharge was motivated by a specific intent to harm the employee, if those allegations are supported by the facts alleged. We have stated that such an intent would trigger the public policy exception. *Yaindl*, 281 Pa.Super. at 573 n. 5, 422 A.2d at 618 n. 5. In *Tourville v. Inter–Ocean Ins. Co.*, 353 Pa.Super. 53, 508 A.2d 1263 (1986), this court determined what the facts had to establish in order to support a claim for wrongful discharge in this situation. It found two instances in which a claim could be made: first, if the pleadings showed disinterested malevolence; or second, if they showed an ulterior purpose for the discharge. *Id.*, 353 Pa.Superior Ct. at 56–57, 508 A.2d at 1265–1266. The court stated that disinterested malevolence would be present if "there were not present a cause, which in every day, civilized life would serve as the basis for the action." *Id.*, 353 Pa.Superior Ct. at 57, 508 A.2d at 1265. In that case, the malevolence would be "pure, unadulterated, and disinterested." *Id.*

The second set of facts which would support a claim for wrongful discharge here must show an ulterior motive. That is, although sufficient reason exists for the discharge, there is another motive present—desire to cause harm to the employee. The *Tourville* court explained how these facts would present themselves: "The quality of maliciousness could be discovered by the lack of proportionality or the impropriety or viciousness with which a thing is done." *Id.*, 353 Pa.Superior Ct. at 58, 508 A.2d at 1266.

Clearly, in the instant case, the Board has offered a reason for Rinehimer's discharge which is plausible and legitimate —it was distraught over the uproar he had caused in the College community and among the community at large. Further, the Board felt that he lacked the leader-

ship to steer the College through the present situation. The facts do not support a claim of disinterested malevolence.

Similarly, we cannot find that Rinehimer has made out a claim of an ulterior motive. Rinehimer has alleged no facts from which we may draw the inference of malice. Under the court's construction of the term in *Turner*, we see no lack of proportionality in Rinehimer's discharge, nor do we see any viciousness or impropriety here. Taking the facts in the light most favorable to Rinehimer, he was discharged because he insisted upon a publicly conducted investigation of the situation. Rinehimer does not dispute the upheaval caused by his actions among either the academic community or the community in which the college was located. The difficulties of running a college under such conditions is obvious. The Board has stated that it had no confidence in Rinehimer's abilities given the turn of events. Moreover, Rinehimer was working on an at-will day-to-day basis; his previous requests that the Board reconsider his contract had been denied. We can see no viciousness in his discharge.

We also do not see that Rinehimer has alleged any other violation of clearly mandated public policy. He alleges no statutory policy which was violated by his termination. We fail to see that any policy which strikes to the heart of his duties, rights, and responsibilities as a citizen was contravened in this case. Rinehimer merely argues that he was terminated for his attempts to "clean house," and that this violated public policy. We hold that the specificity and clarity necessary to sustain such a cause of action are lacking here.

■ In *Rossi v. The Pennsylvania State University*, 340 Pa.Super. 39, 489 A.2d 828 (1985) this court upheld the discharge of an employee who had attempted to convince the administration of the University to adopt his plans to curtail the use of public tax revenues. He claimed that he was discharged for his insistence on this, and that the public policy to save tax dollars was violated by his dis-

charge. *Id.*, 340 Pa.Superior Ct. at 48, 489 A.2d at 833. The court stated:

> The question before us is whether there is a public policy against firing an employee who continuously complains about what he considers to be poor management of the unit in which he is an employee. In every situation in the public sector, where there is poor management, a loss of tax payers' dollars must necessarily follow. Nevertheless, the test is still whether there is a public policy against terminating an at will employee who disagrees with the way in which his supervisors are managing the department encompassing his employment. We think not.

*Id.*, 340 Pa.Superior Ct. at 54, 489 A.2d at 836; *see also Geary*, 456 Pa. at 180, 319 A.2d at 178 ("The most natural inference from the chain of events recited . . . is that Geary made a nuisance of himself [by bypassing the supervisory chain and complaining directly to a vice-president with whom he was friendly], and the company discharged him to preserve administrative order in its own house"); *Turner*, 351 Pa.Super. at 55, 505 A.2d at 261 ("The employee was terminated after an employment tenure of six years. Relations with those who were under his supervision deteriorated significantly during that time . . ."). Further, several federal courts have held that where an employee cannot function with his fellow employees, and the link to a public policy is tenuous, the employee has failed to make out a cause of action for wrongful discharge. *See Adams v. Budd Co.*, 583 F.Supp. 711 (E.D.Pa.1984); *Boresen v. Rohm & Haas, Inc.*, 526 F.Supp. 1230 (E.D.Pa.1981). An analogous situation seems to have existed in the instant case; along with the *Rossi* court, we do not think that a public policy exists against discharging an employee for disagreeing with the policy makers of a college, and for disrupting its administrative operations.

■ It was clearly within Rinehimer's duties as president of the College to bring to the Board's attention irregularities with the functioning of that College. We do not see,

however, that it was also within those duties and rights to cause a major upheaval in the functioning of that university, all of which it is clear from the evidence that Rinehimer's actions did. The Board indicated that his discharge was for this reason, and for his lack of leadership. Further, it should be noted that he was well aware that he was retained on an at-will basis. Considering all these circumstances surrounding his discharge, and the manner in which he was terminated, we cannot find that there was not a legitimate business reason for the termination. The College has the right to operate its business in the way it sees fit; clearly a college cannot be of any benefit to the students or community under such turmoil and public comment as were caused by Rinehimer's insistence on a public audit. As this court stated in *McCartney*, "The fact that an employer's actions seem unfair is not enough." *McCartney*, 353 Pa. Super. at 36, 508 A.2d at 1255. We hold that the trial court's refusal to withdraw entry of the nonsuit was proper.

█ Rinehimer next argues that the trial court erred in granting a nonsuit because he had stated a claim for intentional infliction of emotional distress, and that therefore he should not have been nonsuited on his claim for punitive damages. We do not find that Rinehimer's claim for damages under a charge of intentional infliction of emotional distress presents sufficient facts to show the type of outrageous conduct that is the gravamen of this tort.

It is well settled in Pennsylvania that a cause of action for intentional infliction of emotional distress is made out where the conduct in question is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community...." *Jones v. Nissenbaum, Rudolph & Seidner*, 244 Pa.Super. 377, 383, 368 A.2d 770, 773 (1976) (quoting Restatement (Second) of Torts, 46, comment d (1965)). "It is apparent that the gravamen of this tort is that the conduct complained of must be of an extreme or outrageous type." *Id; see also Banyas v. Lower Bucks Hospital*, 293 Pa.Super. 122, 126,

437 A.2d 1236, 1238 (1982). Pennsylvania courts have found a cause of action for intentional infliction of emotional distress to exist only in limited circumstances, where the conduct has been clearly outrageous. *See, e.g., Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970) (withholding body of deceased child from parents for two months constituted intentional infliction of emotional distress).

The College argues that federal courts have refused to find that a cause of action exists in an employment relationship. It cites *Cautilli v. GAF Corp.*, 531 F.Supp. 71 (E.D.Pa.1982) and *Brieck v. Harbison–Walker Refractories*, 624 F.Supp. 363 (W.D.Pa.1985) in support of its arguments. In both cases, the courts clearly held that loss of employment was too common a happening in today's world to rise to the level of outrageousness necessary to support a cause of action for this tort. *Brieck*, 624 F.Supp. at 367; *Cautilli*, 531 F.Supp. at 74. While we agree that the conduct complained of in those cases was not extreme or outrageous in the manner necessary to make out a cause of action, we do not agree that an employment situation could *never* give rise to the tort of intentional infliction of emotional distress. We are not called upon here, however, to outline the instances in which it might arise. We simply fail to find, after viewing all the evidence presented by Rinehimer in the light most favorable to him, that the conduct of his employer was so extreme and outrageous that a claim for intentional infliction of emotional distress was established. Viewing the evidence in that light, Rinehimer was discharged because his employer was displeased with the manner in which Rinehimer handled the situation that he had caused. This does not rise to the level of outrageous conduct that the courts of this Commonwealth require. *See, e.g., Banyas*, 293 Pa.Super. at 127, 437 A.2d at 1239 (intentional misstatement of cause of death naming appellant as cause held to be intolerable professional conduct and extreme and outrageous).

Further, we note that Rinehimer failed to present competent medical evidence of his emotional distress. Under the

supreme court's recent decision in *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987), failure to present such evidence is grounds for a nonsuit. *Id.*, 515 Pa. at 197, 527 A.2d at 995.

Rinehimer also argues that the nonsuit was improper because he made out a cause of action against the Board on a theory of detrimental reliance. Rinehimer contends that Board members told him that he would be given a contract once the situation had been settled. We can find no justifiable reliance and agree with the trial court that a nonsuit was proper.

■ A cause of action under detrimental reliance or promissory estoppel arises when a party relies to his detriment on the intentional or negligent representations of another party, so that in order to prevent the relying party from being harmed, the inducing party is estopped from showing that the facts are not as the relying party understood them to be. *Straup v. Times Herald*, 283 Pa.Super. 58, 71, 423 A.2d 713, 720 (1980). The elements of promissory estoppel are:

(1) misleading words, conduct or silence by the party against whom the estoppel is asserted,

(2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel, and

(3) no duty of inquiry on the party seeking to assert estoppel.

*Id.*

■ Even assuming that the Board made representations to Rinehimer, we find no evidence that he reasonably relied upon any statements by the Board. He had attempted several times to have his contract reinstated, and each time the Board put him off with an excuse. He was fully aware that he was working on a day-to-day basis. Rinehimer has failed to present the unambiguous proof necessary to give rise to a claim of estoppel.

■ Lastly, Rinehimer complains that the evidentiary rulings made by the trial court were improper. The admission or exclusion of evidence is within the sound discretion of the trial court, and will not be reversed absent a clear abuse of discretion. *Concorde Investments, Inc. v. Gallagher,* 345 Pa.Super. 49, 56, 497 A.2d 637, 641 (1985). Here the trial court found that the proffered testimony of the investigating auditor was not responsive to Rinehimer's questions. Rinehimer, through his examination of that witness, was attempting to discover whether the witness' investigation of financial matters had uncovered any evidence that Rinehimer had been terminated because of his cooperation with the investigation. The witness attempted to testify that other College employees had refused to cooperate because they believed that they would be discharged. The trial court found that this testimony was unresponsive, called for hearsay, and was unduly prejudicial. We cannot conclude that, in making this determination, the trial court clearly abused its discretion.

■ We also find no abuse of discretion in the court's decision that evidence of the criminal prosecutions of Galardi and Lesante should be excluded. As the trial court pointed out in its opinion, proof at trial must conform with and must be limited to the pleadings. *See Willinger v. Mercy Catholic Medical Center,* 241 Pa.Super. 456, 362 A.2d 280 (1976). According to the court:

Plaintiff's Complaint claims he was fired in retaliation for exposing Galardi and LeSante and calling for an investigation into the entire matter.... Thus, the offered evidence was beyond the scope of the matters pleaded. More importantly, we note that Plaintiff's contention that the aforementioned individuals pleaded guilty to the charges was a misrepresentation of facts. We specifically note that under Pa.R.Crim.P. 314, offenses may be dismissed and, thus, cannot be considered as guilty pleas or convictions. Also, it should be noted that the Court did authorize the Plaintiff to introduce evidence that the aforementioned individuals entered into a settlement....

> Consequently, the Court acted properly in preventing the Plaintiff [Rinehimer] from misrepresenting the outcome of the charges filed against LeSante and Galardi.

We agree, and again fail to find any clear abuse of discretion here.

Rinehimer finally contends that it was error for the trial court to exclude evidence of mental anguish. We disagree. As the trial court stated, it is for Rinehimer in his complaint to specify the particular injury or injuries for which relief is sought. This Rinehimer admits he failed to do. It was within that court's discretion to disallow the evidence.

Rinehimer also makes the argument that evidence of lost wages should not have been limited to April 1, 1981. According to Rinehimer, had the Board granted him any contract, it would have been an extended one. Since Rinehimer's only other extended contract had been for three years, Rinehimer argues that he was then entitled to produce evidence of lost wages for a time period of three years. The trial court, instead, only allowed evidence of lost wages for the period that each of Rinehimer's previous one-year contracts had covered. Rinehimer admits, however, that evidence of lost wages is not relevant to his argument that a new trial on the merits should be granted. Since we have found no reason to grant a new trial, we find no need to address this issue.

Similarly, since we do not grant Rinehimer a new trial, we do not address his argument that venue be changed for political reasons.

Upon review of the evidence in the light most favorable to Rinehimer, we find that he has failed to state claims for wrongful discharge, for detrimental reliance and for intentional infliction of emotional distress. Further, we cannot conclude that the trial court abused its discretion in excluding the evidence in question. We therefore affirm the decision of the trial court.

KELLY, J., notes dissent.