J-A04006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| NORTH BROAD ASSOCIATES, LLC AND STOBBA ASSOCIATES, L.P. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STOCKTON REAL ESTATE ADVISORS, LLC | : | |
| | : | No. 1979 EDA 2023 |
| | : | |
| Appellant | : | |

Appeal from the Order Entered June 26, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 190302638

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 14, 2024**

Stockton Real Estates Advisors, LLC (Stockton) negotiated with North Broad Associates, LLP (North Broad) and Stobba Associates, L.P., (Stobba) to procure tenants for their commercial properties.  After tenants were found, Stockton demanded commissions pursuant to an Exclusive Listing Agreement (ELA).  North Broad and Stobba instead filed suit in the Court of Common Pleas of Philadelphia County Civil Division (trial court), seeking declaratory judgments that no commissions were owed because a valid ELA was not in force.[1]  Stockton, in turn, filed six counterclaims rooted in theories of both

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In Count I of the operative pleading, it was also alleged that Stockton tortiously interfered with potential leasing opportunities for North Broad and Stobba.  Summary judgment was granted for Stockton on that count, and the ruling is not being appealed here.

contract and equity. At the summary judgment stage, the trial court granted the declaratory judgments, finding that under the Real Estate Licensing and Registration Act, 63 P.S. §§ 455.1010-455.902 (RELRA), no commissions were due because a valid ELA was not in effect at the relevant times. On that same ground, summary judgment was granted against Stockton as to all of its counterclaims. Stockton appealed the adverse rulings, and we affirm because the lack of a valid ELA precluded Stockton's claims for relief.

North Broad and Stobba each own properties in Philadelphia; the Studebaker Building is owned by North Broad, and Abbotts Square is owned by Stobba. Both North Broad and Stobba are subsidiaries of the same corporate entity, EB Realty Management, which is not a party in this case. Stockton is a real estate brokerage company that operates in Philadelphia.

On February 1, 2016, Stockton sent North Broad and Stobba each a proposed ELA for their respective properties. That same day, a single consolidated version of the ELA with numerous handwritten revisions was sent back to Stockton. This revised ELA was signed by the president of EB Realty Management, Eric Blumenfeld. Although a Stockton agent never signed the revised version of the ELA, it began performing broker services on behalf of North Broad and Stobba by seeking to procure tenants for the Studebaker Building and Abbotts Square. **See** Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment, 1/17/2023, at Exhibit 1, p. 6.

The term of the ELA sent by Blumenfeld to Stockton was from February 1, 2016 to January 31, 2017. **See id**., at ¶ 1. The ELA stated that this term

- 2 -

would end "unless otherwise extended by mutual written agreement of the parties." *Id*. A commission would be due to Stockton if, "during the Term[,] the Property or any portion thereof is leased to a tenant procured by Broker, Client, or any other party." *Id*., at ¶ 3(a). Stockton would also be owed a commission if, within 60 days after the end of the term, a property was leased to a tenant procured by Stockton. *See id.*, at ¶ 3(b).

A tenant for the Studebaker Building, The City of Philadelphia, was not found until several months after the initial term in the ELA had ended, in August 2017. On November 15, 2017, following negotiations between North Broad, Stockton, the City of Philadelphia, and others, a letter of intent to enter a lease was signed. The letter of intent listed Stockton as the exclusive "broker in connection with the transaction." *Id*., at Exhibit 6, p. 4.

The City of Philadelphia's agent was in contact with Stockton's employees, Doug Himmelreich and Mike Dolan, during the negotiations on the lease. A draft lease was circulated among the parties in January 2018, and the lease was fully executed on February 21, 2018. This was over a year after the term of the ELA sent to Stockton on February 1, 2016 had ended. Like the letter of intent, the lease named Stockton as the exclusive broker of the transaction. Further, the lease included a provision that precluded any other party from becoming "entitled to a commission." *Id*., at Exhibit 9, ¶ 25.1. No party other than Stockton was ever formally recognized by North Broad as a broker in connection with that lease, and no party was ever paid a commission

for procuring the tenant. *See* Deposition of Michael Dolan, 11/10/2021, at 144-45, 147.

Once the lease was completed for the Studebaker Building, Stockton also continued looking for a tenant to occupy Stobba's Abbotts Square property. A potential tenant was found, Orange Theory Fitness, and Stockton negotiated a letter of intent naming it as a broker entitled to a commission, but a lease agreement was never completed by Stockton for that property.

In January 2018 and the months that followed, Stockton, North Broad, and Stobba were in talks to execute a new, or extended, ELA to ensure that Stockton would be able to collect commissions for its services. On January 24, 2018, an employee of Stockton emailed North Broad on that subject, stating that it was "your goal to get the agreement signed by . . . early next week." Deposition of Michael Dolan, 11/10/2021, at Exhibit 5.

In a follow-up email sent a week later, Stockton again stressed how "extremely important" it was to have a revised ELA in place before the lease with the City of Philadelphia was completed. *Id*. On April 4, 2018, Stockton contacted North Broad and Stobba once more to confirm the acceptance of commission agreements with respect to Abbotts Square, as well as their receipt of an invoice concerning the completed lease on the Studebaker Building with the City of Philadelphia.

It appears that North Broad and Stobba did not directly respond to Stockton's requests until the parties began litigating Stockton's entitlement to commissions. In those civil proceedings, North Broad and Stobba took the

position that Stockton had never become a broker for their properties, and that even if an ELA had been executed, it would have lapsed before any commissions had become due. **See** Deposition of Eric Blumenfeld, 8/30/2020, at 34; Deposition of Christopher Cordaro, 11/4/2021, at 133, 148-49.

Blumenfeld claimed that he alone procured the City as a tenant for the Studebaker Building, and that Stockton underhandedly "inserted themselves" into the process without being solicited to do so. Deposition of Eric Blumenfeld, 8/30/2020, at 54-55, 69. Blumenfeld and Christopher Cordaro, the vice-president of the company, went so far as to claim that that Stockton employees had "schemed" to have Stockton named as the exclusive broker in the lease for the Studebaker Building by strongarming the City of Philadelphia with the threat of litigation. **See** Deposition of Christopher Cordaro, 11/4/2021, at 144, 172.

However, these accounts conflicted not just with the view of Stockton's representatives, but also with that of the City's agent in the lease negotiations, Domonique Casimir. She stated that Stockton had "brought [the Studebaker Building] to our attention," and acted as a broker in the early stages of the negotiations. **See** Deposition of Domonique Casimir, 9/22/2022, at 13, 28, 36, 43. Casimir further differed from Blumenfeld and Cordaro in stating that the City had never insisted on naming Stockton as the exclusive broker in the letter of intent or in the lease because that arrangement was always strictly

between the property owner and the broker. **See id**., at 46.[2] Casimir also understood that Stockton was the broker because its signage had been put on the Studebaker Building itself, and North Broad was "very aware of Stockton's involvement in the transaction; and they were there for all of the initial meetings." **Id**., at 50.

Nevertheless, North Broad and Stobba filed suit against Stockton in 2019, and in their operative pleading – the amended complaint – they asserted three claims, the first of which (Count I), alleging tortious interference on the part of Stockton, is not at issue in this appeal.[3] In Counts II and III, North Broad and Stobba sought declaratory judgments that they did not owe Stockton any commissions.

_____

[2] Cordaro claimed that the non-party, William Procida, was solely responsible for securing the City of Philadelphia as a tenant and negotiating the lease. Casimir acknowledged that "towards the end" of the transaction, Procida assisted North Broad in finalizing the lease and facilitating the City's tenancy. **See** Deposition of Domonique Casimir, 9/22/2022, at 30-31. Yet, Procida was not a licensed broker, and he was precluded from receiving a commission under the terms of the lease for the Studebaker Building. Cordaro's statements also conflicted with that of his own employer, Blumenfeld, who stated that he himself had procured the City as the tenant of the Studebaker Building, working directly with Casimir to do so. **See** Deposition of Eric Blumenfeld, 8/30/2020, at 34-35, 46, 57-58, 62.

[3] Blumenfeld stated numerous times in his deposition that Stockton had been trying to "shop the lease" for the Studebaker Building after an agreement had already been reached, forcing Blumenfeld to entice the City with a lower rental amount than what had originally been accepted. Despite filing suit against Stockton and alleging tortious interference, Blumenfeld could not recall the names of any of the "multiple parties" who had conveyed that information to him. **Id**., at 83.

Stockton responded with six counterclaims: (Count 1) breach of contract; (Count II) third-party beneficiary; (Count III) declaratory judgment; (Count IV) promissory estoppel; (Count V) unjust enrichment; and (Count VI) fraud in the inducement.

North Broad and Stobba moved for partial summary judgment as to Counts II and III of their amended complaint, as well as and Counts I, II, and III of Stockton's counterclaims. Stockton sought summary judgment as to all three counts of the amended complaint, along with Counts II and V of its own counterclaims.

The trial court granted summary judgment in favor of North Broad and Stobba as to Counts II and III of the amended complaint, and declaratory judgments were entered against Stockton stating that "no commissions are due and owing to [Stockton] pursuant to the purported [ELA] and the ELA is unenforceable[.]" Trial Court Order, 6/26/2023, at ¶ 2. The trial court also granted summary judgment in favor of North Broad and Stobba as to all six of Stockton's counterclaims based on its finding that there was no valid extension of the ELA. *See id*., at ¶ 3. The trial court denied Stockton's motion for summary judgment with respect to Counts II and III of the amended complaint, but summary judgment was granted for Stockton as to Count I. *See id*., at ¶ 4.

Stockton timely appealed, and the trial court filed a 1925(a) opinion, *see* Trial Court 1925(a) Opinion, 8/1/2023, which adopted the prior opinion

that accompanied the order now on review. **See** Trial Court Opinion, 6/26/2023, at 1-8. The trial court ruled that the parties had validity executed an initial ELA with a term that expired on January 31, 2017. **See id**., at 6. The trial court found, however, that "under RELRA the lack of a written agreement providing for an extension of the original ELA, including the new agreement's duration, prohibits its collection of any commission[.]" **Id**. This absence of an extension to the ELA warranted the declaratory judgments for North Broad and Stobba; it was also fatal to all of Stockton's counterclaims, since, as construed by the trial court, RELRA prohibited the recovery of any damages in a dispute over brokerage commissions unless a valid ELA was in effect. **See id**.

Stockton now raises two related issues in its brief:

1. Whether the Trial Court erred in granting summary judgment in favor of [North Broad and Stobba] based on its conclusion that the Parties' ELA was unenforceable and that [Stockton] was barred from receiving any commission due pursuant to [RELRA], despite there being genuine issues of material fact with respect to, among other things, the Parties' acceptance of and mutual agreement to extend the terms of the ELA and the documentation of the same.

2. Whether the Trial Court erred in granting summary judgment in favor of [North Broad and Stobba] on [Stockton's] counterclaims where the reasons for doing so were based on the Trial Court's erroneous conclusion that the RELRA barred enforcement of the ELA and payment of any commission due to [Stockton].

Appellant's Brief, at 5-6.

North Broad and Stobba respond that summary judgment was properly granted as to their declaratory judgment counts because the record supports the trial court's finding that the ELA was never extended past the initial term in a written agreement. As an alternative ground for affirmance, they argue that the trial court did not have to consider whether the ELA was extended because the initial ELA was never signed and executed by Stockton, making the agreement invalid at the outset.

On review of an order granting summary judgment, the trial court's ruling may only be disturbed to correct an error of law or an abuse of discretion. *See ADP, Inc. v. Morrow Motors Inc.,* 969 A.2d 1244, 1246 (Pa. Super. 2009). Our focus is "on the legal standard articulated in the summary judgment rule[,] Pa.R.C.P. 1035.2." *Id*. This rule provides in substance that,

> where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.

*ADP*, 969 A.2d at 1246.

Further, the record must be viewed "in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Id*.

Before addressing whether a question of fact existed as to the existence of a written extension of the ELA, we will first consider the original contract's validity. North Broad and Stobba argue that they only sent a counteroffer when Blumenfeld emailed Stockton on February 1, 2016, and that the revised draft was never fully executed because only Blumenfeld had signed it. North Broad and Stobba have construed the attempts by Stockton to secure an extension of the ELA as an admission that neither an initial ELA, nor an extension, had ever been completed.

We agree with North Broad and Stobba that the ELA sent by Blumenfeld to Stockton was a counteroffer, and not a binding contract when Stockton received it. Although RELRA does not require a broker to execute a brokerage agreement once it has been signed and executed by "the consumer," *i.e.*, Blumenfeld, **see** 63 P.S. § 455.606a(b)(1), the ELA was still governed by fundamental principles of contract law.

The three elements of a contract are an offer, acceptance, and consideration or a mutual meeting of the minds. **See Yarnall v. Almy**, 703 A.2d 535, 538 (Pa. Super. 1997). "An alleged acceptance of an offer is not unconditional and, therefore, is not an 'acceptance' if it materially alters the terms of the offer." **Id**., at 539 (quoting **Thomas A. Armbruster, Inc. v Barron**, 491 A.2d 882, 887 (Pa. Super. 1985)). It is instead a "counter-offer, which has the effect of terminating the original offer." **Id**. "[T]he acceptance

- 10 -

of a counter-offer must be 'unconditional and absolute.'" ***Id***. (quoting ***O'Brien v. Nationwide Mut. Ins. Co.***, 689 A.2d 254, 258 (Pa. Super. 1997)).

In the present case, Stockton sent a draft ELA to Blumenfeld, which he then signed and returned to Stockton. But crucially, the version Blumenfeld sent back to Stockton contained numerous handwritten revisions, many of which altered material terms. For example, Blumenfeld revised the timing provisions of the contract, reducing the number of days that Stockton would have to procure a tenant from 180 to 60 days from the expiration of the contract's term. The interest payable to Stockton in the event of a default by North Broad or Stobba was reduced from 12% to 6%. Any commissions owed to Stockton would be drawn exclusively from lease payments, with none of the commission being due at the commencement of the lease, as Stockon had proposed.[4]

By making material changes to the terms governing the parties' mutual obligations, Blumenfeld effectively terminated Stockton's original offer. What he sent Stockton was only a counter-offer, which was not immediately an enforceable ELA between the parties. While Stockton may have expressed the intent to accept the new terms proposed by Blumenfeld, Stockton never did so in the "unconditional and absolute" manner required by the law of

---

[4] The duration of an ELA "is a material term that must be in writing." ***Michael Salove Co. v. Enrico Partners, L.P.***, 23 A.3d 1066, 1070 (Pa. Super. 2011). RELRA also specifies additional material terms that must be included in a written ELA, such as "a statement of the broker's fee." 63 P.S. § 455.608a.

contract. *Id*. Since there was no meeting of the minds, a valid and enforceable contract was never formed. The trial court therefore erred in finding that the counter-offer sent to Stockton by Blumenfeld on February 1, 2016, was a fully executed ELA on that date.

Regardless, even assuming the initial ELA was a binding contract (which it was not), the trial court correctly ruled that Stockton had failed to raise a genuine issue of material fact as to whether such an agreement was ever extended beyond the initial term. The trial court reasoned that RELRA requires an extension of the ELA's term to be in writing, and no evidence of a written agreement to extend the ELA appeared in the record. Upon review, we agree with the trial court that such evidence is completely absent here.

Under RELRA, a broker may not be entitled to a consumer's payment of a fee for real estate services "unless the nature of the service and the fee to be charged are set forth in a written agreement between the broker and the consumer that is signed by the consumer." 63 P.S. § 455.606(b)(1). The broker is "not entitled to recover a fee, commission or other valuable consideration in the absence of such a signed agreement." *Id*.

RELRA also enumerates the required contents of an agreement between a consumer and a broker. *See* 63 P.S. § 455.608a. These items include a "statement of the broker's fee and the duration of the contract[.]" *Id*., at § 455.608a(1). An "oral modification of a term of an [ELA], which is required under the Act to be in writing, cannot support a claim for commissions or fees

- 12 -

under RELRA." ***Michael Salove Co. v. Enrico Partners, L.P.***, 23 A.3d 1066, 1071 (Pa. Super. 2011). Moreover, the ELA sent to Stockton by Blumenfeld provided that its term could only be extended by "mutual written agreement of the parties." Support of Motion for Partial Summary Judgment, 1/17/2023, at Exhibit 1, ¶ 1.

Stockton does not identify in the record a written agreement to extend the ELA, instead arguing that the record supports an inference that such an agreement had gone into effect based on the conduct and communications between the parties. However, the emails and documents cited by Stockton do not raise an inference that the parties had agreed, much less reduced to writing, an extension of the ELA. At most, those materials demonstrated that Stockton wanted, or thought it had, a mutual understanding that it was North Broad and Stobba's broker beyond the initial term of the ELA. But that alone does not raise an inference that there exists a written agreement to that effect, as is required by RELRA to give Stockton a contractual entitlement to the commissions it now seeks.

Accordingly, the trial court did not err in granting declaratory judgments for North Broad and Stobba that the ELA was unenforceable and that no commissions were owed to Stockton. For that same reason, the trial court did not err in granting summary judgment for North Broad and Stobba as to Stockton's counterclaims – (Count 1) breach of contract; (Count II) third-party beneficiary; (Count III) declaratory judgment; and (Count VI) fraud in

the inducement (to enter a contract). In all four of those counterclaims, Stockton relied on contractual grounds to assert a right to commissions as the exclusive broker of the Studebaker Building and Abbotts Square. But since, under RELRA, a written ELA was a prerequisite for receiving those commissions, the claims lack merit as a matter of law. *See Enrico Partners, L.P.*, 23 A.3d at 1071.

Having determined that Stockton could not prevail on its counterclaims predicated on there being a written ELA, we turn to whether the trial court erred in finding that RELRA similarly barred Stockton's two remaining equitable causes of action – (Count IV) promissory estoppel, and (Count V) unjust enrichment, neither of which require the parties to have executed a written agreement in order for relief to be available.

First, the trial court did not err in granting summary judgment for North Broad and Stobba on Stockton's unjust enrichment counterclaim. We have previously held that, in the absence of a valid ELA, a broker cannot recover damages resulting from an unpaid commission regardless of whether a claim is being asserted under a theory of contract *or* quasi-contract (unjust enrichment).

In *Commercial Realty Grp., Inc. v. Market Square Plaza Asscs.*, No. 1233 MDA 2020 (Pa. Super. filed August 23, 2021) (unpublished memorandum), we explained that the doctrine of unjust enrichment allows a court to acknowledge the existence of a contract by implication, whereas

RELRA strictly requires a *written* agreement to make a brokerage commission recoverable. We adopt that panel's holding that, "had the trial court allowed Appellant's unjust enrichment claim to go forward, it would have acted contrary to the plain language of Subsection 455.606a(b)(1) of RELRA which precludes a recovery of a fee, commission, or other consideration for brokerage services absent an express contract signed by the licensee and the party from whom the licensee seeks the commission." *Market Square Plaza*, at *12.

Stockton's remaining counterclaim, promissory estoppel, is likewise barred for the reasons articulated in *Market Square Plaza*. The doctrine of promissory estoppel "makes otherwise unenforceable agreements binding" in the absence of a valid contract or consideration. *Crouse v. Cyclops Indus*., 745 A.2d 606, 610 (Pa. 2000). To establish a promissory estoppel cause of action, a party must prove three elements:

> (1) the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

*Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997) (citations omitted). A "promise" in this context has been described as "misleading words, conduct or silence by the party against whom the estoppel is asserted[.]" *Rinehimer v. Luzerne Cty. Comm. Col.*, 539 A.2d 1298,

1306 (Pa. Super. 1988) (quoting **Straup v. Times Herald**, 423 A.2d 713, 720 (Pa. Super. 1980)).

Here, even if we were to find that evidence in the record raises a question of fact as to all three elements of a promissory estoppel cause of action, the claim would still be barred. Stockton seeks to enforce a promise rather than a contract so that it can recover a broker's commission in consideration for its brokerage services. RELRA plainly prohibits that remedy unless entitlement to it arises from a written contract, **see** 63 P.S. § 455.606(b)(1). Allowing a party to circumvent RELRA's requirements by resorting to equitable remedies would defeat the purpose of the statute. **See e.g., Strausser v. PRAMCO, III**, 944 A.2d 761, 767 (Pa. Super. 2008) ("[T]he doctrine of estoppel simply cannot be invoked against the operation of the Statute of Frauds."). Thus, the trial court's order must be affirmed in its entirety.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/14/2024

- 16 -