Frederic SHERMAN

v.

PRUDENTIAL–BACHE SECURITIES
INC., David Reppert, Henry Thomas,
and Richard Hevner.

Civ. A. No. 88–3677.

United States District Court,
E.D. Pennsylvania.

Nov. 28, 1989.

Judith Chomsky, Philadelphia, Pa., for plaintiff.

Daniel E. Bacine, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Defendants, Prudential–Bache Securities, David Reppert, Henry Thomas, and Richard Hevner, move for summary judgment on all of plaintiff's claims. Plaintiff Frederic Sherman brought this action against his former employer, Prudential–Bache, and three individual brokers employed by Prudential–Bache claiming (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) employment discrimination in violation of 42 U.S.C. § 2000e–2; (3) age discrimination in violation of 29 U.S.C. § 623; (4) breach of contract; (5) tortious interference with an employment relationship; (6) tortious interference with business relationships; (7) defamation; and (8) intentional infliction of emotional distress.

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party.

### I.

Viewing the facts in the light most favorable to the plaintiff, the facts giving rise to this action are as follows. In June 1984, plaintiff Frederic Sherman, a Jew, was hired as a stockbroker with Prudential–Bach in its Philadelphia office. At that time, plaintiff was living in Reading, Pennsylvania. Initially, plaintiff considered moving his residence to Philadelphia. For personal and financial reasons, however, plaintiff decided to remain living in Reading and commute to Philadelphia.

In the winter of 1984, plaintiff became a financial reporter on the stock market on KYW–Radio. On his radio broadcast, plaintiff was introduced as follows: "for Prudential–Bache, Fred Sherman." When plaintiff began his broadcast, he only had one spot in the evenings. By the time he left Prudential–Bache in 1987, plaintiff did an afternoon spot, two evening spots, and a Saturday spot.

Prudential–Bache was pleased with plaintiff's radio spots, which it considered a valuable form of marketing. In 1987, when plaintiff signed a contract as a financial advisor with CBS–TV, Prudential–Bache's regional manager agreed to have Prudential–Bache pay plaintiff's required union dues.

In Philadelphia and Reading, plaintiff was well known and had a good reputation as a business analyst and stockbroker. In Reading, plaintiff was known for his charitable work both within and without the Jewish community.

In 1985, plaintiff began experiencing back problems associated with his travel to and from Philadelphia. At that time, he sought a transfer to Prudential–Bache's office in Reading. This transfer was approved by the regional manager, the Philadelphia branch manager, and the Reading branch manager. In November 1985, Prudential–Bache began to transfer his accounts to Reading. The transfer, however, never went through as planned because a petition was circulated among the brokers in the Reading office in opposition to plaintiff's intended transfer. The petition was signed by everyone in the Reading office except Ruth Kins, a Jewish individual. Defendant Reppert, a broker in the Reading office, told Sherman that "we don't need you people, your type of people, in the Reading Office." Sherman Deposition at 71. Subsequently, plaintiff was told by the manager of the Reading office that he could not transfer to Reading.

Plaintiff continued to work in Prudential–Bache's Philadelphia office. In the winter of 1986 and the spring of 1987, plaintiff was hospitalized in Philadelphia because he was suffering from kidney stones. In addition, plaintiff was having increasing problems with his prostate. Because of his physical problems, plaintiff had to stop frequently on his trips to and from Philadelphia.

In September 1987, plaintiff made another request to transfer to the Reading office. Plaintiff informed the regional manager that he was requesting a transfer for health reasons and because his mother was terminally ill in a nursing home in Reading. The regional manager told plaintiff to speak to the Reading branch manager about the transfer. In late September 1987, plaintiff met with the Reading manager who agreed to permit the transfer. The regional manager then confirmed plaintiff's transfer to Reading.

In late October 1987, plaintiff met with the Reading branch manager to finalize his transfer to Reading. Shortly thereafter, the Reading manager was approached by several brokers in the Reading office, including defendants Reppert and Thomas. These brokers informed their manager that they would resign from Prudential–Bache if plaintiff was permitted to transfer to Reading. As a result of these threats of resignation, the Reading manager informed plaintiff that there was a problem with his intended transfer. The Reading manager then informed the regional manager about the brokers' opposition to plaintiff's transfer. Several days later the regional manager informed plaintiff that he would not be permitted to transfer to Reading because three brokers, who together produced 50% of the business of the Reading office, objected to his transfer and had threatened to resign.

In 1987, during the time that plaintiff was seeking a transfer to Reading, there were openings at the Prudential–Bache Reading office which Prudential–Bache was attempting to fill. In late August or early September 1987, Eleanor Collins, a non-Jew, was permitted by the regional manager to transfer from Prudential–Bache's Harrisburg office to the Reading office. By November or December 1987, the Reading branch was running newspaper advertisements to recruit stockbrokers.

As a result of these newspaper advertisements, the Reading branch of Prudential–Bache hired Marty Radvanyi, a non-Jew, in March 1988.

After it was clear that he would not be permitted to transfer to the Reading office, plaintiff sought approval to transfer to either the Bryn Mawr or Bala Cynwyd office. Transfer to either office would have cut down on plaintiff's commuting time. Both transfer requests were refused, however, even though other brokers had been permitted to transfer from Philadelphia to other offices.

In November and December 1987, plaintiff learned several things concerning his job which greatly concerned him. The interim branch manager of the Philadelphia office, Robert Hayden, informed plaintiff that Prudential–Bache would discontinue by the end of December 1987 many of the perquisites which he had earned because he was a top producer. Hayden told plaintiff that he would no longer be receiving his $200 per month housing allowance or his additional gross commissions which it paid to cover a part of the salary of his assistant. In addition, Hayden threatened to review plaintiff's allocation of secretarial time. Hayden told plaintiff repeatedly that it would be better if he found employment elsewhere and that he was too old to rebuild his client base after the "crash" of October 19, 1987. Plaintiff was sixty-three (63) years old at that time.

As a result of this disturbing information, plaintiff became convinced that management had a very negative attitude towards him and was trying to force him out of Prudential–Bache. Consequently, to protect his own interests, plaintiff began looking for employment with another brokage firm. At the time when he began looking, plaintiff had not conclusively decided to leave Prudential–Bache but was merely exploring his options.

On January 4, 1988, plaintiff resigned. On the following day, January 5, 1988, plaintiff went to work for Butcher and Singer, Inc., a brokerage firm in Reading.

## II.

### A. FEDERAL CLAIMS

#### 1. Claim of Racial Discrimination

■ Plaintiff claims that the defendants did not permit him to transfer to Reading because he was Jewish, in violation of 42 U.S.C. § 1981. In order for plaintiff to succeed on this claim, he must show that the defendants intentionally discriminated against him because he was Jewish. *See General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Defendants contend that plaintiff has established no facts from which a reasonable jury could conclude that defendants discriminated against the plaintiff because he was Jewish.

In 1985, plaintiff's requested transfer to Reading had been approved, and Prudential–Bache had even begun transferring his accounts to the Reading office. Because of the petition in opposition to plaintiff's transfer, however, the manager of the Reading office told him that he could not transfer to Reading. Defendant Reppert, the broker in Reading who circulated the petition, told Sherman that the Reading office did not need his kind of people. *See* Sherman Deposition at 71. Although plaintiff never asked Reppert what he meant by "your kind of people," plaintiff said he had heard the expression before and recognized it has an anti-semitic remark. *See* Sherman Deposition at 72.

Therefore, a jury could find that plaintiff's intended transfer in 1985 did not take place because (1) the majority of brokers in the Reading office did not want him since he was Jewish and (2) the manager of the Reading office permitted the prejudice of those brokers to control his decision whether to permit the transfer.

In September 1987, plaintiff made another request to transfer to Reading based upon personal health reasons and the fact that his mother was terminally ill in a nursing home in Reading. *See* Exhibit Y at ¶ 11 of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. Just like the intended

transfer in 1985, plaintiff received permission to transfer from both the regional manager and the Reading manager. Just as in 1985, however, the transfer did not take place because of broker opposition. Three brokers, who together produced 50% of the business of the Reading office, threatened to resign if plaintiff was transferred to Reading. One of these brokers was Reppert, the same broker who in 1985 circulated the petition and made the allegedly anti-semitic remark.

Therefore, if a jury found that plaintiff's transfer in 1985 was denied because he was Jewish, a jury could also find that his transfer in 1987 was denied because he was Jewish. This is especially true since it appears that the same individual led the opposition movement on both occasions and that individual made remarks to Sherman which were allegedly anti-semitic in nature.

Therefore, there are genuine issues of material fact as to whether plaintiff's transfers were denied because his employer acquiesced to its employees' discriminatory intent in opposing plaintiff's transfer to the Reading office.

### 2. Claim of Employment Discrimination

Plaintiff claims that he received discriminatory treatment when he was denied his requested transfers to the Reading office because he was Jewish, in violation of 42 U.S.C. § 2000e–2(a)(1). Defendants contend that plaintiff has failed to establish a prima facie case of discrimination.

In proving his employment discrimination claim, plaintiff relies on the three step burden-shifting method of proving discriminatory treatment in the workplace established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court refined this three-step method of proof:

> First, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Defendants contend that plaintiff has failed to meet his burden of proof in the first step and, alternatively, in the third step.

In *McDonnell Douglas Corp. v. Green,* the Supreme Court stated that a plaintiff may establish a prima facie case of racial discrimination by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. Thus, plaintiff can establish a prima facie case of disparate treatment without actual proof of discriminatory motive because it can be "inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

For the purpose of deciding this motion, I find that plaintiff has established a prima facie case of discrimination. Plaintiff, a Jew, sought a transfer from the Philadelphia office to the Reading office of Prudential–Bache. Plaintiff was qualified to work as a stockbroker and held the same position in Philadelphia, where he had proven himself to be a successful broker. At the time of his requested transfer in 1987, there were openings for stockbrokers in the Reading office and a non-Jewish broker, Eileen Collins, was permitted to transfer from the Harrisburg office to the Reading office. After plaintiff was informed in October 1987 that he would not be able to transfer to Reading as planned, Pruden-

tial–Bache advertised during the months of November and December 1987 for stockbrokers in the Reading office. As a result of that advertising, the Reading office hired a non-Jewish stockbroker in March 1988.

■ For the purpose of this motion, I also find that defendants have articulated a legitimate non-discriminatory reason for not permitting plaintiff to transfer to the Reading office. In their memorandum in support of their motion for summary judgment, defendants contend that Prudential–Bache denied plaintiff permission to transfer because of a general unwritten policy against transfers out of the Philadelphia office.

With respect to the third step of this burden-shifting process, plaintiff offers three reasons why defendants' nondiscriminatory reason for denying plaintiff's transfer is pretextual. First, plaintiff contends that the reason is pretextual because it is different from reasons previously offered by defendants. In their answer to plaintiff's interrogatory 17(b) requesting the basis for the decision to refuse plaintiff's transfer, defendants state that the transfer was denied because plaintiff had demanded special treatment in the Reading office similar to the treatment he had received in Philadelphia. *See* Exhibit W of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. In their answer to plaintiff's interrogatory 24 requesting the reason given to plaintiff why his transfer was denied, defendants state that the Reading manager informed plaintiff that his transfer would not work out because there were too many problems. *See* Exhibit X of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment.

Second, plaintiff contends that Prudential–Bache's policy against transfers out of the Philadelphia office is pretextual because that reason does not take into account Prudential–Bache's policy of granting transfers to accommodate employees with health problems. Plaintiff informed Regional Manager Salzman that he was seeking a transfer to Reading because of his health problems and because his mother was terminally ill in a nursing home in Reading. Salzman admitted that Prudential–Bache has a policy of accommodating people who request transfers on the basis of health reasons. *See* Salzman Deposition at 62. Contrary to that policy, however, Salzman summarily disregarded plaintiff's request and never ascertained whether plaintiff did indeed have health problems which made his commute to and from Philadelphia difficult. *See* Salzman Deposition at 52. In fact, Salzman admitted that he did not permit plaintiff's health problems to influence his decision with respect to plaintiff's requested transfer. *See* Salzman Deposition at 52. Furthermore, in June 1986, Prudential–Bache had permitted another stockbroker, Roy Malis, to transfer from the Philadelphia office to the Jenkintown office because his parents were severely ill and he was required to provide daily care for them. *See* Exhibit 1 of Plaintiff's Memorandum Contra Defendants' Supplemental Motion for Summary Judgment.

Finally, plaintiff contends that defendants' reason is pretextual because numerous other stockbrokers were granted permission to transfer out of the Philadelphia office as long as they had a good reason. For example, stockbroker Elliot Fine was permitted to transfer to Princeton because he had gotten married and his wife lived in Princeton. *See* Salzman Deposition at 42. Robert Gabriel was also permitted to transfer to Princeton because Fine, with whom he had formed a partnership, had been transferred to Princeton. *See* Salzman Deposition at 43. Matthew McClosky was permitted to transfer to the Bryn Mawr office to be with his uncle. *See* Salzman Deposition at 43. Roy Malis transferred to Jenkintown to be near his severely ill parents. *See* Exhibit 1 of Plaintiff's Memorandum Contra Defendants' Supplemental Motion for Summary Judgment. Prudential–Bache had even planned to permit plaintiff to transfer to the Reading office until his transfer was opposed by brokers in that office. *See* Sherman Deposition at 437–38.

In light of these reasons and the evidence submitted in support thereof, I conclude that a jury could find that defendants' legitimate nondiscriminatory reason for denying plaintiff's transfer from the Philadelphia office to the Reading office is pretextual. Therefore, plaintiff's claim of employment discrimination is not ripe for disposition by summary judgment.

### 3. Claim of Constructive Discharge

■ Plaintiff claims that he was constructively discharged by defendants because he was Jewish.[1] In support of this contention, plaintiff relies on the following activities of the defendants: (1) reneging on its agreement to transfer him to Reading; (2) denying his requested transfer to which he was entitled under Prudential-Bache's policy of transferring employees with health problems; (3) informing him that many of his benefits would be taken away at the end of December 1987; (4) accusing him of misconduct; and (5) threatening to fire him. *See* Sherman Deposition at 395. Defendants contend that, since plaintiff had begun discussing employment opportunities with Butcher and Singer in mid-November 1987 prior to finding out that he would be losing his perquisites, plaintiff's constructive discharge claim must fail because he was already planning on resigning.

■ A constructive discharge claim is established by proof that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir.1984). No specific intent on the part of the employer to bring about a discharge is required for application of the constructive discharge doctrine. *Id.* "Classifying a termination as a con-

structive discharge rather than a voluntary quit has significant ramifications with respect to the scope of relief." *Id.* at 887.

In the present case, a jury could conclude that Prudential-Bache denied plaintiff's requested transfers to the Reading office knowing that the employees objected to the transfer because plaintiff was Jewish, and knowing that the commute to and from Philadelphia was difficult for the plaintiff because of health reasons. Therefore, a jury could find that Prudential-Bache knowingly acquiesced to the prejudice and bias of the employees in the Reading office.

The fact that plaintiff began discussing employment possibilities with the firm Butcher and Singer in November 1987 does not make such a finding any less probable. Plaintiff knew by November 1987 that he was not going to be permitted to transfer to Reading or any other office closer to Reading. After more than three years of commuting, plaintiff, who was sixty-three (63) years of age at the time, knew that he could not continue commuting to Philadelphia forever and also knew that Prudential-Bache was not going to permit him to transfer to the Reading office. Therefore, a jury could find that, because Prudential-Bache continually denied plaintiff's requested transfers, plaintiff was forced to begin looking for employment in Reading because a reasonable person in his position would have found the commuting intolerable. Plaintiff believed that Prudential-Bache was forcing him to resign and, thus, was protecting himself and his family by searching for another job.

The disturbing news that plaintiff learned through his several meetings with Hayden only served to reaffirm his belief that Prudential-Bache was forcing him out. *See* Exhibit U to Plaintiff's Memorandum Contra Defendants' Motion for Summary

---

1. It is not clear whether plaintiff is bringing his constructive discharge claim pursuant to 42 U.S.C. § 1981 or § 2000e-2. In paragraph 46 of the Second Amended Complaint, it appears as though plaintiff is claiming constructive discharge under section 1981. In his Memorandum in Opposition to Defendants' Motion for Summary Judgment, however, plaintiff relies on *Goss v. Exxon Office Systems Co.*, 747 F.2d

885 (3d Cir.1984), which discusses a constructive discharge claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

Section 2000e-2 is the appropriate section under which to bring the constructive discharge claim because that section specifically prohibits discharging an employee on the basis of race, color, religion, sex, or national origin.

Judgment. There is no direct proof that Hayden's decisions with respect to plaintiff were motivated by the fact that he was Jewish. Nonetheless, even without considering Hayden's actions, a jury could find that defendants constructively discharged plaintiff by continuously refusing his requested transfers.

### 4. Claim of Age Discrimination

■ Plaintiff claims that Prudential–Bache constructively discharged him because he was too old to rebuild his clientele after the stock market "crash" on October 19, 1987, in violation of 29 U.S.C. § 623. At the time that plaintiff left Prudential–Bache and went to work for Butcher and Singer, he was sixty-three (63) years old. Defendants contend that plaintiff has not met his burden of proving discrimination on the basis of age.

■ Plaintiff correctly states that the three-step method of proof set forth in *McDonnell Douglas* is inapplicable when a plaintiff presents direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). In *Trans World Airlines*, the Court noted that the "shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'" *Id.* Therefore, when a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* test is not applicable. *Id.*

Unlike his other discrimination claims, plaintiff has direct evidence in support of his age discrimination claim. Prudential–Bache's interim manager of the Philadelphia office, Robert Hayden, told plaintiff at a meeting in December 1987 that he was too old to rebuild his client base after the "crash" on October 19, 1987, that he was burned out, and that it would be better if he found employment with another company. *See* Sherman Deposition at 150, 477–78. During this same meeting, Hayden also told plaintiff that Prudential–Bache would be discontinuing many of the perquisites that he had earned because he was a top producer. In particular, Hayden informed plaintiff that, at the end of December 1987, Prudential–Bache would discontinue plaintiff's additional gross commissions to cover part of the salary of his assistant; that it would no longer be paying him a $200 per month housing allowance; and that the secretarial support time that he was receiving would be reviewed and most likely cut back. *See* Sherman Deposition at 114–15.

Based on this evidence, I conclude that a jury could find that Prudential–Bache discriminated against plaintiff on the basis of his age.

## B. STATE CLAIMS

### 1. Claim of Breach of Contract

■ Plaintiff claims that, by refusing to transfer him to the Reading office after initially promising to do so, Prudential–Bache breached its contract with him. Defendants contend that this claim should fail because there was no consideration underlying the contract.

Defendants may be correct in stating that there was no consideration underlying the agreement between Prudential–Bache and plaintiff. A jury, however, could find that there was detrimental reliance, which is a substitute for consideration. *See* Restatement (Second) of Contracts §§ 79 & 90. A promise which would otherwise be unenforceable becomes enforceable if (1) the promisor should reasonably expect to induce action or forbearance on the part of the promisee and (2) the promise does induce such action or forbearance. *Id.* at § 90.

Prudential–Bache made a promise that it would transfer plaintiff from the Philadelphia office to the Reading office. *See* Sherman Deposition at 56. Upon reaching that agreement, plaintiff informed his clients that he would be transferring to Reading. *See* Exhibit Y at ¶ 13 of Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. Plaintiff also announced his intended transfer to KYW–Radio, which began to arrange a special hook-up that would permit him to

record regularly from the Reading office. *See* Exhibit Y at ¶ 15 of Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. Based on Prudential–Bache's agreement that plaintiff could transfer to Reading, plaintiff turned down the offer of Judge Eugene Wisniewski to share an apartment in Philadelphia. *See* Exhibit Y at ¶ 14 of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. Moreover, plaintiff refrained in September 1987 from looking for employment with other Reading brokerage firms. *See* Exhibit Y at ¶ 16 of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. Prudential–Bache did not inform plaintiff that he would not be permitted to transfer until late October or early November 1987.

I conclude that there is ample evidence in the record from which a jury could find that plaintiff relied to his detriment upon Prudential–Bache's promise that he would be permitted to transfer to the Reading office.

### 2. Claim of Tortious Interference With an Employment Relationship

 Plaintiff claims that defendants Reppert and Thomas tortiously interfered with his employment relationship with Prudential–Bache. Defendants contend that this claim should fail because (1) there was no contract and (2) the actions of Reppert and Thomas did not affect the regional manager's decision to not permit plaintiff to transfer to Reading.

In *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), the Pennsylvania Supreme Court approved of Section 766 of the Restatement (Second) of Torts which sets forth the elements of the tort of intentional interference with contract.[2] 393 A.2d at 1183. Section 766 states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by

inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

In September 1987, Prudential–Bache agreed that plaintiff would be permitted to transfer to Reading. In late October 1987, after plaintiff had finalized the arrangements for his intended transfer, the manager of the Reading office informed him that three stockbrokers had threatened to resign if plaintiff was transferred to Reading. Thereafter, Regional Manager Salzman told plaintiff that he could not transfer to the Reading office because the brokers who opposed his transfer produced 50% of the business in the Reading office. *See* Sherman Deposition at 87.

I conclude, as with the breach of contract claim, that there is ample evidence from which a jury could find that an agreement or contract existed between Prudential–Bache and plaintiff with respect to his transfer to the Reading office. I further conclude that there is evidence in the record from which a jury could find that Regional Manager Salzman denied plaintiff's transfer as a result of the actions of defendants Reppert and Thomas.

### 3. Claim of Tortious Interference with Business Relationships

 Plaintiff also claims that Prudential–Bache tortiously interfered with his business relationship with many of his clients. Defendants contend that this claim should fail because plaintiff cannot prove that he suffered any harm as a result of defendant's allegedly wrongful conduct.

There is both documentary and testimonial evidence of harm caused to plaintiff by the conduct of Prudential–Bache after he became employed by Butcher & Singer. According to Regional Manager Salzman, a client's request to have his account transferred from Prudential–Bache to Butcher & Singer is executed electronically and should

---

**2.** Section 766B of the Restatement (Second) of Torts establishes the elements of the tort of

intentional interference with a prospective contractual relation.

be completed within one week to ten days. *See* Salzman Deposition at 81–82. Plaintiff, however, experienced significant delays in the transfer of his clients' accounts. *See* Sherman Deposition at 129. Assistant Manager Spilove was made aware of the problems involving the transfer of plaintiff's clients' accounts as early as March or April 1988. *See* Spilove Deposition at 116. Spilove contends that, although she did not look into plaintiff's claims, she took steps to straighten out the problem. *See* Spilove Deposition at 117. Nevertheless, the business records of Butcher & Singer reflect that the transfer of accounts belonging to plaintiff's clients were delayed as much as seven months. *See* Exhibits AA–HH of Appendix to Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment. As to each account transfer which was delayed, plaintiff was prevented from conducting business and, thus, deprived of potential commissions.

Therefore, I conclude that there is evidence from which a jury could find that plaintiff was harmed as a result of Prudential–Bache's conduct after he resigned.

### 4. Claim of Defamation

 Plaintiff claims that defendants Prudential–Bache and Richard Hevner defamed him by falsely accusing him of misconduct in connection with his work as a stockbroker. Defendants make two contentions with respect to this claim. First, defendants allege that mere opinion cannot form the basis of a defamation claim and that nothing in the record suggests that Hevner offered anything more than his opinion about plaintiff's skill as a stockbroker. Second, defendants contend that the defamation claim cannot stand because plaintiff did not sustain any damage as a result of Hevner's statements.

Under Pennsylvania law, opinion statements may be defamatory. In *Burns v. Supermarkets General Corp.*, 615 F.Supp. 154 (E.D.Pa.1985), the court cites with approval section 566 of the Restatement (Second) of Torts which defines when an opinion may be defamatory. *Id.* at 158. Section 566 provides:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed facts as the basis for the opinion.

In *Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir.1985), the Third Circuit Court of Appeals also cites section 566 of the Restatement (Second) of Torts when explaining the circumstances in which statements of opinion may be the basis for an action in defamation:

Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion. In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion.

758 F.2d at 972.

Plaintiff's action for defamation is based upon statements of Hevner made to other brokers and persons who called Prudential–Bache for information concerning plaintiff as well as statements of Prudential–Bache management concerning plaintiff's alleged compliance problems.

The record demonstrates that Hevner made statements regarding plaintiff's conduct and ability as a stockbroker without adequately disclosing the factual basis for those statements. If the facts underlying Hevner's opinion statements are false, then those opinion statements are defamatory. Because the record does not clearly establish the basis for Hevner's statements, the record must be more fully developed in this area.

With respect to defendants' second contention, under Pennsylvania law, statements imputing business misconduct are slander per se and actionable without proof

of any special harm. *Chicarella v. Passant,* 343 Pa.Super. 330, 494 A.2d 1109, 1115 n. 5 (1985). In *Chicarella,* the court relied on section 570 of the Restatement (Second) of Torts which states in pertinent part:

> One who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other ... matter incompatible with his business, trade, profession, or office, as stated in § 573 [3][.]

Defendants are not correct on either of their contentions. Therefore, plaintiff's claim for defamation is not ripe for disposition on summary judgment.

### 5. Claim of Intentional Infliction of Emotional Distress

■ Plaintiff claims to have suffered emotional distress as a result of the intentional conduct of Prudential–Bache. Defendants contend that the tort of intentional infliction of emotional distress is not cognizable in Pennsylvania and that, even if it were, there is no evidence of conduct sufficient to give rise to such a claim.

Although Pennsylvania courts have been cautious in declaring conduct "outrageous" so as to permit recovery for intentional infliction of emotional distress, they do recognize the tort. *See Cox v. Keystone Carbon Co.,* 861 F.2d 390, 394–96 (3d Cir.1988) (citing and discussing Pennsylvania cases which have recognized the tort of intentional infliction of emotional distress). However, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Buczek v. First National Bank of Mifflintown,* 366 Pa.Super. 551, 558, 531 A.2d 1122, 1125 (1987). As a preliminary mat-

ter, it is for the court to determine as a matter of law whether the defendant's conduct is sufficiently outrageous to support a claim for intentional infliction of emotional distress. *Salerno v. Philadelphia Newspapers, Inc.,* 377 Pa.Super. 83, 546 A.2d 1168, 1172 (1988).

Courts applying Pennsylvania law have rarely found conduct in the employment context which would rise to the level of outrageousness necessary to provide a basis for recovery for the intentional infliction of emotional distress. *See Brieck v. Harbison–Walker Refractories,* 624 F.Supp. 363, 367 (W.D.Pa.1985) (discharge from employment, although unfortunate, cannot in and of itself provide a basis for recovery for intentional infliction of emotional distress), *rev'd on other grounds,* 822 F.2d 52 (3d Cir.1987), *cert. granted,* 485 U.S. 958, 108 S.Ct. 1218, 99 L.Ed.2d 420 (1988); *Cautilli v. GAF Corp.,* 531 F.Supp. 71, 72–75 (E.D.Pa.1982) (employer's deceiving an employee into foregoing other employment opportunities in order to benefit itself does not provide a basis for recovery for intentional infliction of emotional distress); *Madreperla v. Williard Co.,* 606 F.Supp. 874, 879–80 (E.D.Pa.1985) (employer's engaging in a premeditated plan to force an employee to resign by making employment conditions more difficult does not provide a basis for recovery for intentional infliction of emotional distress); *Rinehimer v. Luzerne County Community College,* 372 Pa.Super. 480, 494, 539 A.2d 1298, 1305 (1988) (discharge of an employee does not rise to the level of outrageousness necessary to state a claim for intentional infliction of emotional distress).

Courts applying Pennsylvania law have found conduct outrageous when an employer engaged in sexual harassment and other retaliatory behavior against an employee. *Bowersox v. P.H. Glatfelter Co.,* 677 F.Supp. 307, 309–12 (M.D.Pa.1988) [4]; *Shaf-*

---

**3.** Section 573 provides:

> One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private

office, whether honorary or for profit, is subject to liability without proof of special harm. Restatement (Second) of Torts § 573.

**4.** Two federal district courts in the Eastern District of Pennsylvania have refused to follow *Bowersox: Koch v. American Tel. & Tel. Co.,* No.

*fer v. National Can Corp.,* 565 F.Supp. 909 (E.D.Pa.1983). One court found outrageous an employer's conduct in repeatedly denying the employee promotions, requiring the employee to devote considerable time and energy in defending her performance, and ultimately discharging the employee. *Cory v. Smithkline Beckman Corp.,* 585 F.Supp. 871, 875 (E.D.Pa.1984).

In the present case, although defendants may have engaged in a premeditated plan to force plaintiff to resign by making employment conditions more difficult, they never discharged the plaintiff. When compared with the facts of cases in which the courts have found outrageous conduct, the facts of the present case do not establish conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Buczek,* 366 Pa.Super. at 558, 531 A.2d at 1125.

Therefore, I conclude as a matter of law that defendants' conduct is not sufficiently outrageous to permit plaintiff's claim of intentional infliction of emotional distress to go to a jury. Accordingly, I will grant defendants' motion for summary judgment with respect to this claim.

### III.

Defendants have failed to prove the absence of issues of material fact with respect to all of plaintiff's claims, except plaintiff's claim for intentional infliction of emotional distress.

On September 29, 1989, I denied defendants' motion for summary judgment with respect to all of plaintiff's claims. By the order that follows, I shall amend my order of September 29, 1989 so as to grant defendants' motion with respect to plaintiff's claim for intentional infliction of emotional distress.

### ORDER

Upon consideration of defendants' motion for summary judgment, plaintiff's re-

88–9208, 1989 WL 37123 (E.D.Pa. Apr. 13, 1989); *Clemens v. Gerber Scientific Inc.,* No. 87–5949,

sponse, and the parties' memoranda, and for the reasons stated in the accompanying memorandum, it is ORDERED that:

1. Defendants' motion as to plaintiff's claim for intentional infliction of emotional distress is GRANTED.

2. Defendants' motion as to all of plaintiff's other claims is DENIED.

This order will amend my order dated September 29, 1989.

slip op. at 11–13, 1989 WL 3480 (E.D.Pa. Jan. 13, 1989).